May it please the Court. Good morning, Your Honors. David Nimmer, appearing on behalf of Plaintiff Appellant Claire Milne, represented by her Court-Appointed Receiver Michael Coyne. When Congress passed the Copyright Term Extension Act in 1998, it added an additional 20 years of copyright protection that no one expected. Congress decided that those 20 years should go to the author's children and grandchildren. To make sure that they could capture the new term, Congress gave them the right to terminate pre-1978 grants, and it swept away all contracts that operated to the contrary of statutory termination. It expressed its intent in the Copyright Act in simple and categorical terms. Statutory termination may be effectuated notwithstanding any agreement to the contrary. This case involves an agreement to the contrary, in particular, a 1983 agreement to redate the party's 1930 grant into calendar year 1983, which the parties styled rescission and regrant, a style that the parties adopted for the purpose and the only purpose of defeating the present and future statutory termination rights. Now, a contract to change the date from before 1978 to after 1978 in order to avoid statutory termination is an agreement to the contrary. That is the situation at bar. We are here on this appeal because the district court gave effect to that agreement to redate the 1930 grant to 1983. Can you tell me, I think you cite Stewart v. Avend to support your argument that the 1983 agreement constitutes an agreement to the contrary. My question is, does Stewart really interpret the agreement to the contrary language? No. The decision in Stewart v. Avend, of course, concerned the second opportunity that Congress gave authors, the reversion of renewal rights, which occurs in the window of 28 to 56 years. But in the course of that, the Supreme Court discussed Congress's continuing efforts to protect authors. And the Supreme Court at that juncture said Congress also gave a third opportunity to authors and their children and their grandchildren to recapture copyrights. And that was an inalienable right, unlike the present right that the Supreme Court was construing. Well, I guess what I'm saying is you cite Stewart for essentially that premise, and I'm not finding that it really helps me interpret the language agreement to the contrary. In terms of focusing on that precise language of Congress, Your Honor, the only thing that the Supreme Court said was that the right that Congress conferred was inalienable, namely it could not be granted away. But the holding of Stewart v. Avend, Your Honor is quite right, does not go further in helping us in this case. It is the holding of Marvel that we'll reach in a moment that is of greater assistance. But nonetheless, Stewart v. Avend is relevant in determining how Our Highest Court characterized the right that Congress granted to recapture in the 1976 Act. Mr. Newmur, is it your position that in 1983, Milne was not authorized to recapture the 1930 Act, that he was authorized to rescind the agreement, the 1930 agreement? That is correct. In 1983, Christopher Milne had no right to rescind the 1930 agreement, and he did not. All right. But what's the authority for that, that they couldn't rescind an agreement? Because Christopher Milne had no rights in the 1930 agreement. The rights of the 1930 agreement belonged to A. A. Milne. He passed them by will to his testamentary heir. That is the Pooh Properties Trust. That is a completely separate entity from Christopher Milne. That is why the Pooh Properties Trust was the party that purported to rescind and regrant the rights. And that is also why Christopher Milne's participation in the 1983 grant, in the 1983 agreement, was very limited. He did not purport to rescind. He did not purport to regrant. Indeed, the only thing he did was to stand up, as it were, and to say, gentlemen, do not terminate their father's grants. I want nothing to do with the copyright, he stated, by his actions, because he did not own it before 1983, and he did not own it after 1983. Therefore, he did not rescind. He did not purport to rescind. Did he sign the contract? Yes, he did sign the contract, Your Honor. He kept saying he this and he that. What he did was in the contract. What you're  Absolutely not, Your Honor. What I'm saying is that he only purported to do one thing in the contract. He purported to state, I do not intend to terminate. He did not purport to rescind. He did not purport to regrant. The Pooh Properties Trust — A little more than the contract than that. I beg your pardon? A little more than the contract than that. They settled some undisputed issues. There's a modification amount of money. He did quite a few things by signing his name on the contract. I take it that he did quite a good deal, but you're saying he didn't have authority to do anything. No, Your Honor, not at all. What I'm saying is he only did one thing in the contract. He only stood up and said, I did not own the rights in the past, and I do not intend to own them in the future. That's in the contract? Yes, Your Honor. The party that owned the rights is the Pooh Properties Trust. So he said, I have no authority to sign this contract, but I'm going to go ahead and sign it. No, he did not say I have no authority to sign this contract. What he said is, I do not own the copyright. I do not intend to recapture the copyright. And then he sat down. The Pooh Properties Trust owned the copyright. It was the test of entry successor to A.A. Milne. The Pooh Properties Trust, in that capacity, purported to rescind the contract and then to regrant the rights. Your Honor has inquired whether Christopher Milne did well by the — by this new agreement. Well, I guess — but isn't that what he did there is so that there would be no — that the contract would be unassailable so that he couldn't come back later and then say, well, you know, Pooh Properties was, you know, giving away something that was mine. All he did was to say, I do not own the copyright and I will not recapture the copyright. Now, whether he did it in order that it would be unassailable is something that does not appear on the face of the contract, so it would be speculation to attribute a motive to him. But Judge Wallace has asked about whether Christopher Milne did very well by the contract. If you read SSI's brief, one gets the impression that it was a tremendous benefit to Christopher Milne and to Claire Milne what happened in 1983. I'd like to contrast what would have occurred in true statutory termination versus what actually happened by the Pooh Properties Trust rescinding and regranting. The differences are as vast as day and night in both form and substance. I'm going to start with form because form is important in many areas of the law, making a will, selling a house, waiving an ethical conflict. And 304C is a statute that minutely regulates form. Had there been a true statutory termination, then numerous safeguards would have applied. First of all, it would have to be effectuated by serving an advanced notice in writing. It would have to be served on the grantee and the grantee's successor in title. It would have to state the effective date of the future termination, comply in form content and manner of service with Copyright Office regulations. And then a further grant could only take effect after the notice of termination has been served, and it would need to be recorded in the records of the Copyright Office. None of those safeguards contained in Section 304C4 were in effect — were in fact complied with by the so-called rescission and regranting. The actual state of affairs after the 1983 agreement was that there is no advanced notice in writing, no service on the grantee or its successor, no compliance with Copyright Office regulations, no waiting to undertake a further grant until after the notice had been served, and no recordation in the Copyright Office. But a moment ago, Judge Wallace asked, didn't Christopher Milne, in fact, do very well by this termination? We have to look at substance now. Given a true statutory termination, the substance would have been as follows. All the rights granted by A. A. Milne in 1930 would have reverted to Christopher Milne. He would have owned 100 percent of those rights. He could have kept them to himself and not exploited them. He could have exploited them himself. He could have assigned them to 20th Century Fox, or he could have turned around and sold them to Disney. What actually happened after this so-called rescission and regrant? Christopher Milne himself received zero percent of the royalties from the Pooh Properties Trust, because the record in this case is undisputed in the excerpts of record on page 365 and on page 101, that Christopher Milne was not a beneficiary of the Pooh Properties Trust. So the party that rescinded and regranted was the Pooh Properties Trust. Of the royalties that it received, Christopher Milne received zero percent. I think what you're suggesting is that he should have been represented better by counsel who would understand the circumstance and would have not allowed him to sign the contract. But now he's signed the contract, whether it's good or bad. He got some good, he got some bad. But I don't understand what you're saying, that he had no authority to sign it. Who did? Your Honor, he had authority to sign the contract. Oh. And the Pooh Properties Trust had authority to sign the contract. The Pooh Properties Trust had authority to, under State law, to engage in a rescission or regrant. Federal law, however, says that termination may be effectuated notwithstanding any agreement to the contrary, notwithstanding the fact that the Pooh Properties Trust signed an agreement. We do not contest that Christopher Milne had no authority, and we do not subscribe to the proposition that he should have had better counsel. He accomplished exactly what he wanted to accomplish. He wanted to make the statement, gentlemen do not terminate their father's grants. And so he did so. He said, it matters not what newfangled right Parliament might confer on me or the U.S. Congress might confer on me. I do not intend to recapture any copyrights. And he effectively made that state of affairs come to pass. He had the right to choose not to terminate the additional 19 years that Congress gave him. Then Congress came along in 1998 and accorded an additional 20 years, an additional 20 years that was not expected when the 1983 grant was signed, and that additional 20 years, which belongs to the author's granddaughter, can be exercised as long as termination has not previously been effectuated. I'd like to talk about the author's benefit from exercise of the piece of paper. I've already mentioned that Christopher Milne, according to the record, was not a beneficiary. It's important to add that, according to the record as well, there is no indication that Claire Milne was a beneficiary of the Foo Properties Trust in 1983. For that reason, SSI seeks to go outside the record. It has made a motion to supplement the papers that it submitted on the cross motions for summary judgment, and it has asked the Court improperly to take judicial notice. Well, are you saying that neither Christopher or Claire got no financial advantage from the 1983 agreement? Under the record, that is the case. I'd like to talk about the supplemental supplementary. That's a lawyer's answer if I've ever heard it. I'd like to talk about what Mr. Zissou has tried to submit outside the record. According to those extra documents that are not part of the record, Claire Milne was to have received one-quarter of one-half of the 5 percent that the Foo Properties Trust was getting. If you work through the math, Claire Milne was supposed to receive less than 1 percent of the royalties generated by the 1930 grant of her grandfather. Now, a true statutory termination would have meant that 100 percent of the interest would go to Christopher Milne. The actual State Affairs means that somewhat less than 1 percent went to his daughter, Claire Milne, assuming one accepts the additional evidence. But those precise figures are much less important than the general principle. The general principle is that statutory termination is a right to recapture the rights for the benefit of the author's children and grandchildren, not to have at most a fraction of the rights or some type of benefit. The language of the 1998 Copyright Term Extension Act that I referenced is that the granddaughter may terminate, quote, where the owner of the termination right has not previously exercised such termination right. Congress did not say you have no right to terminate if you benefited from it or if your father did something that, as Your It's painfully obvious that in the language of the statute, Christopher Milne never previously exercised his termination right. He never got the rights back. He never granted or regranted anything. He never fulfilled the procedural requirements that go into statutory termination. Accordingly, nothing that he did can be deemed a statutory termination that would eliminate the rights that his daughter has in a new statutory term. Claire Mill, therefore, has the right to terminate these additional 20 years that Congress added for her benefit in 1998. And with the Court's permission, I would reserve the balance of my time for rebuttal. Roberts. Certainly. Thank you very much. Good morning. Good morning, Your Honors. My name is Roger L. Zissou. I represent the defendant, Appellee Stephen Schlesinger, Inc. The only question on this appeal, and it's a question of law and it's a question of statutory interpretation, is whether Claire Milne ever had a right of termination in the first place. And the answer is provided if there's any plain meaning involved. It's in the first paragraph of Section 304C of the statute, which is brought into play by 304D. Milne has conceded this in its brief, its reply brief at pages 5 through 7, where it says that only when there is a right of termination that that right may be exercised. And that's the first question. We don't get to agreement to the contrary, which is in 304C.5, until we first find out if anybody had a right of termination. If they had a right of termination, then we get to whether something has happened that's in agreement to the contrary. And I'll deal with that later, which has not happened. But if we look at 304C, by the way, Milne over and over again, they keep saying if there's a right of termination. Mr. Nimrin this morning said, had there been a right of termination, and then he showed you what the percentages would be, and in the brief they said if there was otherwise a valid right of termination and if there was a right of termination. But 304C sets forth three criteria, among others, through 304D, which answers the question. In order for there to be a right to termination in the first place, there has to be a still-existing grant that was made before January 178. If there is no still-existing grant, there's no right of termination. And here there was none. There was none because in 1983, this agreement took place so that thereafter, there is no 1930s grant to terminate. Okay. So why don't you tell us from your perspective, what is the 1983 agreement? Mr. Nimrin told us what it is and what it isn't from his perspective. The 1983 agreement is a combination of things. It's a long agreement. It's a new agreement that achieves a new economic relationship, and based upon it, in conjunction with opinions they got from counsel, Professor Melville Nimmer, at the time, they were advised that this was an agreement which, based upon Section 304C, the first paragraph, would be an agreement that would not be assailable under any basis under the termination provision. Let me ask you a question on that.  The agreement went to the expert. Yes. He gives an opinion. Yes. Was it exactly the same contract that was entered into, or was the contract modified subsequent to the time the expert looked at it? There were some differences. But the substance was to create a revocation and a regrant. And that core is exactly what's in the 83 agreement, among many other provisions. This is something in the briefs that the modification dealing with a moment of time had been modified. Yes. Was that part of the contract modified subsequent to the time the expert saw it? Well, I think if we look at Professor Nimmer's letter, he says the only thing that gives him pause with regard to a rescission and a revocation and regrant at the same time is the moment of freedom. Right. He does conclude that that's a remote difficulty. And if we go to his treatise, which explains the basis for his thought about moment of freedom, we find that it was based at the time on a misunderstanding of State law. Well, has any court ever accepted the moment of freedom argument? No. No court has ever accepted it. And in the treatise, it's based upon a view that under California or State law, which were the State laws that would have applied to this contract, which was not under Federal law, they allowed for novations. They allowed for revocations and regrants simultaneously. So that wasn't the – there was no basis for that. And if you read the treatise today, it's still saying the same thing, and there's no basis for it. We have other arguments. I would like to just come back to 304C, what I call the first question. There's another reason why this – there was no right of termination in the first place. The Pooh Properties Trust's trustees, whom counsel has identified as the only people who had rights in 1983, and that's true, but they took by will. And the statute says in order for you to have a right of termination, the grant that you're terminating must be otherwise than by will. And this is an absolutely another basis that's emerged for affirmance here. The will was A.A. Milne's will. And he decided to set up a trust for the benefit of his family. And it's not true that Christopher Milne was completely separate from Clare Milne. When he signed, he had already – and we've requested you take judicial notice of this fact, which is really not disputed – he had already assigned a portion of the beneficial interest that he would have received from the trust to his daughter. The Pooh Properties Trustees were acting at the behest and pursuant to the will of A.A. Milne. There are many ways in which they've acted over the years. So the idea that there's this separate fight between the family is mind-reading because there's no basis for it. And the reason we ask you to take judicial notice of these documents is that we have statements in the reply brief at page – I think it's at page 8 – that the progeny of A.A. Milne were not part of and didn't benefit from the 83 agreement. I don't understand on what theory we can take judicial notice of these documents.  The theory is that we are faced with, in the brief in this case and in the argument this morning of statements, that Christopher Milne was acting in the 83 agreement. No, I'm not making myself clear. How – what gives us the right to take judicial notice of these documents? I understand what point you want to make with them. The right is – They're not like almanac facts. They're – No, but – They weren't before the district court, right? I'm sorry? They weren't before the district court, right? They weren't before the district court because we were trying to get them for a year in discovery, and we only got them pursuant to an order. For whatever reason, they weren't before the district court. The reason we ask is they are the kind of things you can take judicial notice. There's no dispute about them. And, indeed, in the opposition to the motion, there's no dispute about the fact of it. That's not the standard for taking judicial notice, whether it's disputed or not. If you want that, you need to get a stipulation. But you don't have it. No, we don't have a stipulation. Let me ask you another question. Yes. Under your understanding, after the 83 agreement, there was nothing left of the agreement of the 1930s, the agreements in 1930s. Because the Pooh Properties Trustees – Is that a yes? Yes. That's a yes? Yes. Your opposition says this 83 agreement was just a modification of the 30s agreement. That is, there's nothing in the 83 language that says they're to be completely not considered, they're to be done away with, that this is in replacement of. What's your understanding of how we treat the 83 agreement in relationship to the agreements of the 90s as far as what is provided in the 90s? What is the basis of your contention that it's a – You mean the 30s? Let me finish the question. What's the basis of your contention that this is a completely new agreement and we don't consider any of the prior agreements? I think you're referring to the 30s? Yes. Okay. The basis is that the agreement provides that, first, the 30s agreement is revoked. Revoked, to me, means it's of no further force. And then there's a regrant. But it's revoked. And that's really it. There are many other provisions. And they – if you look at those provisions, they reorder the compensation. They have all kinds of provisions about the different rights that are involved and are regranted. And so there's nothing – apart from the revocation, the 83 agreement would be completely inconsistent with the 30s agreement because it's a complete new economic arrangement looking forward. So the agreement of the – of 83 doesn't say this is a new agreement. Your argument is based on the idea that it revoked the 30s agreement. Yes. Absolutely. Okay. I understand. Because it's not redated, as counsel has suggested. And in their complaint in the district court, they said it was merely an amendment of the royalty provision. I think if you read the two side by side, you'll find that one has been revoked and there's a completely new arrangement. Okay. But we think that the argument to the contrary argument by Milne is it's got the cart before the horse and really stands the analysis on its head. Before you get to that, as we've urged, you have to find there was a right of termination. And otherwise, the provision applying to what happens, assuming there's a right of termination, would engulf the conditions. 304C, first paragraph, lays down the conditions under which any grant or disposition of copyright rights is subject to termination. If you have an agreement today, if you don't have an agreement that's subject to termination, that's the end of the story. You never reach agreement to the contrary. Well, isn't that terrible? We've heard a hearts and flowers story about how terrible that is. But Congress, and that's what 304C, first paragraph, Congress made this decision. And they made this decision very carefully. There's another kind of agreement that could take place today under the statute that would also make termination not applicable, a work-for-hire agreement. Under 101, subdivision 2 of the definition of work-for-hire in the present statute, there must be an independent contractor who does the artwork or the literary work, and then there has to be an agreement that the work is made for hire. The consequence of that is that the work is made for hire. And you know that can't be recharacterized after the fact, right? That's correct. No, you can't. You have to do it prospectively, basically. There's some ripples on that. It could happen maybe very closely. That's what they're saying you're doing, that you are recharacterizing this after the fact. We're not recharacterizing anything. There's a new transaction. Nobody said the 30s agreement. By the way, work-for-hire is not what's involved in this case. But nobody's recharacterizing. There's a new arrangement. And Congress allowed it. How do we know Congress allowed it? Well, they didn't say, first of all, we have the conditions under which termination rights exist. Is there an agreement, first question. Is there a grant subject to termination? Congress didn't say, as counsel has argued, they swept aside all contracts. They never said that. That would be an alarming proposition. They did modify. They did modify slightly what authors and publishers could do in their contracts. They did. But they did line drawing. They did it because of the Fred Fisher Musa case we've heard a lot about in the briefs. But there were two vices that worked to defeat the intent to give families the benefit of renewal under the old statute. And the two vices were is that at the outset, after a work is created, we had authors with unequal bargaining power with publishers. And we also had authors who couldn't appreciate, were not at a time through exploitation to appreciate the value of the rights they were giving up. So that was the goal. That was the target of termination. But that didn't mean that all rights to contract and form the history of a property under 304C first paragraph were eliminated by Congress. Indeed, we know the reverse. Now, we don't think the plain meaning argument, there is no precedent for plain meaning anywhere, neither Professor Melville Nimmer in the opinion letter, nor the treatise then or today, the Goldstein treatise, the Patry-Lachman treatise, nor any court has ever said that you look at 304C5, concoct it or come up with a plain meaning argument, and it swallows up what comes before it in 304C1. In addition, we have the statute doesn't define itself. There's a whole set of definitions in section 101 of the statute. We don't have agreement to the contrary defined. Yes. Kagan. Well, let me ask you about that. Given that the enforcement of the 1983 agreement would prevent the appellant from terminating the copyrights granted to your client, why isn't that enough to satisfy the definition of an agreement to the contrary? Why isn't that what? Enough to satisfy the definition of an agreement to the contrary. Well, let's decide that she had, Claire Millam had an agreement, that there was an agreement or a grant subject to termination in the first place, and the will alone, as well as the dates involved, mean that there was no such grant available. Was Congress stupid? They didn't understand that? I don't think so. Otherwise, why would they in the legislative history, not only in the legislative history for 203A, but in 304C, Congress said, likewise, nothing in this section or legislation will alter the existing state of the law of contracts relating to the circumstances under which an author may terminate a license transfer or assignment. This is what Congress said. We're asked to put that all aside, that they were crazy, maybe, or fools. I don't think so. And it runs through 203A, where the Congress also says that, by the way, the legislative history for this statute was developed over 20 years. It's been given special deference by all the courts, including the Supreme Court. This legislative history is a book of almost 200 pages. It was written in the identical language in almost all respects, and certainly those involved here, by the House and Senate Judiciary Committees. The legislation passed the House of Representatives by 75 to 0, and in the Senate by 316 to 7. This is not some wisp of divining congressional intent. And so what we do with those things, Congress knew about this, but they didn't have this transaction that's involved in the 83 agreement, did not have the vice of Fred Fisher, the Fred Fisher Music case. And we're asked by opposing counsel, what are the limitations? Why isn't this a blueprint to circumvent termination? Well, there are limitations, and there is a blueprint, but it's perfectly lawful. And here are the standards. What we say is, yes, our courts decide particular cases. That's the first principle and limitation. And second, we're avoiding the evils of Fred Fisher Music, namely, we're not going to have a giving away by authors in advance of their future reversionary rights when they don't have equal bargaining power and when they're not at a point where they can assess the value. And then we look here, another fact here. Who are the participants in the 83 agreement? The Pooh Properties Trust took by will. That right is holy. And, of course, that right means they can dispose of those rights. If they have the rights by will under 304C, which is conceded at paragraph 6 of the reply brief, of course, they can deal with their rights or they would have an illusory right and they would be powerless. The Pooh Properties Trustees were acting at the behest of the author. Christopher Milne was the author's son. He signed the agreement. He didn't sign certain provisions. It says in the opening paragraph who the parties are. And then the parties word is referred to again in the end of the agreement, and he signed. His lawyer, his solicitor was Michael Jordan Brown, also signed. But he signed in several capacities. It turns out he was what's called the head or the chief of the Pooh Properties Trustees, and he was a Pooh Properties trustee. At the time, we now know that he's also the receiver for Claire Milne, and we also know that she benefited from this transaction that was orchestrated or put together by her father, the Pooh Properties Trustees, and her receiver. Her receiver was also Christopher Milne's solicitor. Would you explain to me where Disney fits into this? Where Disney fits into this? Okay. Disney also signed, obviously. Disney was concerned that in the future they'd probably want to have a transaction where they could go forward and invest in the property as they had done magnificently but not be cut off by a copyright termination. So they were interested. They obtained the Nimmer opinion letter, which is addressed to Peter Nolan, business counsel, and they had a major role. You know, the only party that had almost no bargaining power is Schlesinger in 1983. Well, this particular agreement was, it seemed to me in reading the agreement, this agreement almost looked like a settlement agreement for many issues. They were putting a lot of things together. Well, that's true. And I assume Disney had contentions with the parties and wanted those settled as everybody else did. Well, that's true. The only question is whether the signer had the power to do what the contract purports. In the blue brief, in the opening brief, counsel argues that this right was invalid, it's inalienable, and you can't do away with it. And in the blue brief, in the opening brief, counsel argues that this right is invalid, and cites some language from Justice O'Connor and Stewart, if in fact it's inalienable, the case is over, you lose and we reverse. But the statute doesn't say inalienable. What the statute says is you can't – if there is a right of termination, which I belabored that point, but if you get down to is there – is this an agreement to the contrary, you get down to the fact that statute says that you can't have an agreement to the contrary. It talks about an agreement to make a will. It talks about an agreement to make a – to not make a – to take the right away in the future. In the legislative history for 203A, it talks about waiving in futuro. Alienable means transfer. The cases they've cited, one of the music sales talks about contracting away, which is a term also used in the legislative history. So when you're talking about what does it mean, and it's not defined in the statute, the kind of terminology used is not suggesting flat inalienability, which destroys freedom of contract entirely. Freedom of contract is left in place, except to the extent modified because of the Fred Fischer music case. And the Supreme Court has told us that in areas where State law is – controls, there's a presumption against preempting and obliterating entirely State law. And that – we submit that did not happen here. Okay. Thank you very much. Justice, your time is up. Thank you. Okay. Thank you. Good morning. Mr. Nimmer, you get the last word. Thank you, Your Honor. As Judge Wallace has observed, if the right is inalienable, then the case is over. Judge Callahan asked a question. If the 1983 agreement stands in the way of termination, isn't that enough? And the answer is, yes, it is enough. That is the holding of the sister circuit, the Second Circuit. I'd like to talk about the Marble case briefly. Mr. Zissou was looking at this case through the lens of contract law, saying this was a new agreement with new economic relationships. That may well be. Indeed, in the Marble case, the parties entered into a new agreement with new economic relationships. Well, I have a question about Marble, too, which if you can – didn't the contract at issue in that case attempt to change the nature of the copyrighted work itself, transforming the creator of the copyrighted work into an employee for hire? Your Honor. You know, I mean, that seems – that doesn't seem to quite fit here. It fits in the following way. The Second Circuit did not look at whether that contract was trying to change the nature of the work. The only thing the Second Circuit looked at was copyright law. It looked at the statute and said 304c5 does indeed mean inalienable. If we were to give this contract effect, that would mean that there is no right to terminate. Now, this contract in the case of Marble was developed in 1969. It had the effect of avoiding termination, but it was not made for the purpose of avoiding termination because Congress did not enact it until seven years later. In the case at Bar, by contrast, we have the same effect of avoiding termination that was present in Marble, and we also have the deliberate purpose expressed on the face of the agreement. The reason the parties are entering into this agreement, which they're calling rescission and regrant, is to redate the agreement, is to say the 1930 agreement was really dated in 1983, so it's no longer a pre-1978 grant. Now, looking at the question, was Congress crazy? Were they fools? Mr. Zissou would have you look, go into the cocktail party of legislative history and identify one snippet from the legislative history. The best way to realize what was on Congress's mind, what was its intent when it enacted the statute, is to review the statute. Let me ask you this, though. Let's just assume that we go into the thorny, you know, briar patch of legislative history in interpreting agreement to the contrary. Is there any legislative history that you can point to to support your argument that the 1983 agreement qualifies as such an agreement? As the Second Circuit elucidated when it went through the legislative history, the whole purpose between 304 and C-5 was to avoid the specter of Fred Fischer music. What was Fred Fischer music? That was a case in which Congress intended to safeguard authors, their children and their grandchildren, but the user industries figured out we could use contract law to get around it. We'll simply have the individual sign a contract. Congress wanted to make sure that would not happen again. Congress did not limit itself to say, well, we want to make sure it doesn't happen in advance. Congress said we want to make sure this does not happen at any time, which is why Congress used the language in the statute. Termination may be effectuated notwithstanding any agreement to the contrary. The rest of 304C is replete with temporal limitations, with all sorts of terms of years which are very technical to construe. 304C-5 has none of those temporal limitations. It simply says in the most simple and categorical terms in which Congress could express itself. Termination may be effectuated notwithstanding any agreement to the contrary. Does your argument get somewhat weakened, though, when Congress uses specific examples? Well, no. No, Your Honor, because the specific example it uses was only in the context of Section 203. Section 203 is a different animal than the one we have here. Section 203 has a series of new windows of termination. And in that context, and only in that context, Congress said the parties may enter into a new agreement which will be subject to a new termination window. Congress could not have been talking about Section 304C because there is only one termination window under Section 304C. When Congress said we're not affecting State law, if that's given the broadest interpretation, then the statute itself is nonsense. What Congress said in the statute is termination may be effectuated notwithstanding any agreement to the contrary. So it's simply nonsensical to state categorically that any agreement, including an agreement to the contrary, will eliminate termination. Mr. Zissou would interpret an agreement to the contrary as the following. I hereby make a grant, and I agree I will not terminate that grant. That is an impossible construction of Section 304C. Congress passed it with respect to works from 1906 through 1976. Congress could not have meant perhaps A. A. Milne had prophetic powers and he signed a grant in 1930 that says I hereby give you the rights, Stevens-Lessinger, and I promise I will not terminate them in case Congress should eliminate a new scheme in 46 years. When Congress said in 304C-5 that termination may be effectuated notwithstanding any agreement to the contrary, what Congress had in mind is after it put the pen to paper on the law, the user bar would mobilize and would try to figure out a way around this, just as it did in the Fred Fisher Music case. And indeed, Congress was correct, because the user bar did try to get around it. And the result is the 1983 contract, which is an attempt to redate the 1930 contract to 1983 in order to put it beyond termination. What did Professor Melville opine about that contract? He did not opine about anything about that contract. He was not provided with that contract. He was given a summary of terms of a different contract, a contract that had not a simultaneous revision and regrant, but instead had a rescission followed by a regrant. He consistently throughout his career said a simultaneous rescission and regrant is a nonentity. So he could not possibly have approved of this particular contract, the 1983 agreement. For all these reasons, we respectfully submit that the decision below should be reversed. Thank you. Thank you, Mr. Zimmer. Mr. Zissin, thank you very much. The case has just started. You just submitted it. Good morning.
judges: Wallace, Silverman, Callahan